# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 13, 2010

## STATE OF TENNESSEE  v. STEVEN CORNELL GRAY

**Appeal from the Circuit Court for Madison County**
**No. 08-717     Donald H. Allen, Judge**

---

**No. W2009-01611-CCA-R3-CD - Filed November 30, 2010**

---

The defendant, Steven Cornell Gray, appeals from his Madison County Circuit Court jury conviction of possession with the intent to sell .5 grams or more of cocaine. He claims that the evidence was insufficient to support the conviction, but upon our review of the case, we affirm this conviction.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Joseph Taggart, Jackson , Tennessee, for the appellant, Steven Cornell Gray.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The jury convicted the defendant of possession of cocaine with intent to sell, theft, and evading arrest. The jury acquitted him of possession of a firearm during the commission of a felony. In this appeal, the defendant challenges only the drug conviction, maintaining that the convicting evidence was legally insufficient.

At trial, Tennessee Bureau of Investigation (TBI) Special Agent Max Anderson testified that on June 13, 2008, he was assisting TBI Special Agent Rhodes in an "undercover drug operation." He testified that the agents used a TBI vehicle that contained audio and video equipment. The remotely positioned agents could monitor via an audio broadcast the activities that occurred inside the vehicle. The activities could be video recorded.

TBI Special Agent Ken Rhodes testified that, on June 13, 2008, he participated in arranging an undercover drug operation targeting the purchase of "three ounces of crack cocaine from a subject only known as Thug," based upon information supplied by a confidential informant. On the morning of June 13, the agents briefed and searched the informant and provided the purchase funds in the amount of $2,700. Agent Rhodes testified that he recorded the serial numbers of the currency used.

Agent Rhodes testified that a meeting at a gas station was arranged with "Thug" via telephone calls. He testified that he and the informant drove to the location in a Lincoln Navigator owned by the TBI. At the location, three individuals arrived in a green Cadillac. One of the individuals, identified by the informant as "Thug," left the Cadillac and approached and entered the Lincoln. "Thug" instructed the informant to go to the Cadillac and have it pull up behind the Lincoln. According to Agent Rhodes, "Thug" went to the Cadillac, "and a minute later, the informant comes back and hands [Agent Rhodes] a clear plastic bag that appears to be crack cocaine." He testified that "Thug" then came back and "asked about it and he says he's going to send his brother and we said that was okay." "Thug" returned to the Cadillac, and a "subject" known as "Boo" came to and entered the back seat of the Lincoln.

Agent Rhodes testified that "Thug" was Artavis Douglas and that "Boo" was the defendant. Agent Rhodes testified that a third man, later identified as Kevin Murrell, was "with them" and that this man watched the proceedings from a picnic table near the gas station.

Once in the Lincoln, the defendant "kept saying he wanted to count the money and he would put his hand on the bulge" in his waistband. When Agent Rhodes asked to see the drugs, the defendant held "up his hand kind of far away and [Agent Rhodes] could see that it look[ed] like crack cocaine and powder cocaine in his hand." Agent Rhodes gave the defendant the money to count, "and then the next minute he jumps out" without leaving behind the material in his hand. The Cadillac pulled up, the defendant and Murrell got in, and the Cadillac left.

Officers in other vehicles attempted to stop the Cadillac which drove a short distance away. When the officers forced the Cadillac to stop, "Thug" started screaming; the officers arrested him and Murrell. The defendant ran into the woods on foot. Agent Rhodes testified that the officers recovered from the Cadillac crack, powder cocaine, and a handgun but no money. He testified that the material given to him as a sample by "Thug" was crack cocaine.

According to the transcript of the evidence, Agent Rhodes played via compact discs the video and audio recordings of the events that occurred in the Lincoln on June 13, 2008;

however, these compact discs are not contained in the appellate record.

Agent Rhodes testified that both Mr. Murrell and Mr. Douglas ("Thug") pled guilty to charges related to the events "in this matter."

Agent Rhodes testified on cross-examination that the defendant possessed no controlled substances when he was ultimately arrested. The agent recalled that the cocaine found in the Cadillac on June 13, 2008, was located in the front seat and that the defendant got into the back seat of the Cadillac before it left the gas station. Agent Rhodes agreed that the video recordings did not show the defendant in possession of cocaine or a weapon.

On redirect examination, Agent Rhodes testified that he saw the defendant in possession of narcotics, that when he asked to see "the dope," the confidential informant said, "All right. At the same time." The defendant held up his hand "with what appeared . . . to look like crack cocaine and then he put it down and [Agent Rhodes] handed him the money." The agent testified that this action was not captured on the video recording.

Former TBI Special Agent Corey Graves[1] testified that he arrived on the scene on June 13, 2008, after the Cadillac had been stopped. Agent Graves searched the Cadillac and found a loaded .38 caliber handgun in the "front part of the passenger compartment." He also testified that he found a package of material he believed to be cocaine in the Cadillac's front seat.

Agent Graves testified that a search of the wooded area near the location of the Cadillac revealed some currency on the ground and some placed on top of a limb of a tree. Serial numbers of some of the currency matched those of some of the bills used in the June 13 undercover operation. The currency found totaled about $2,000.

TBI Agent Doug Pate testified that he also saw the handgun in the front seat area of the green Cadillac and that he was aware that other officers recovered what appeared to be narcotics from the same area in the car.

TBI Special Agent Cathy Ferguston testified that, during the undercover drug transaction, she and another officer were positioned in a vehicle across the street from the gas station and that she monitored an audio transmission of the events unfolding in the Lincoln. She testified that she heard what she believed was an ongoing drug transaction, and then she heard Agent Rhodes say "something to the effect of 'Get him. Get him.'" Agent

---

[1]Agent Graves testified that, at the time of trial, he was an agent with the United States Secret Service.

Rhodes reported to Agent Ferguston that "he had just been robbed." She testified that she joined in the chase of a green Cadillac. After the Cadillac was stopped, she removed Mr. Murrell from the driver's seat and another officer removed a second man from the front passenger seat. Agent Ferguston testified that she saw a handgun in the car and "what [she] believed to be narcotics." These items were in the console area between the front seats.

Madison County Sheriff's Investigator Chris Long testified that, from a vehicle driven by Agent Anderson that was parked near the gas station, he also monitored the audio transmission of the drug transaction at the gas station on June 13, 2008. He testified that when Agent Rhodes informed the other officers that the money had been taken, he saw the green Cadillac take off "at a rapid pace from the parking lot." Agent Anderson activated his lights and siren and pursued the Cadillac. The Cadillac was eventually stopped when it was "boxed in by two vehicles with emergency equipment going." Investigator Long saw a man "flee from the passenger side of the vehicle and take off into the woods." Investigator Long assisted in the pursuant of the fugitive through the woods. He testified that Jackson Police Officer Shane Beaver apprehended the man whom Investigator Long identified as the defendant. When the officers found no money on the defendant, they searched the wooded area where they saw the defendant emerge from the woods. Upon retracing the defendant's path through the woods, the officers found money in some "greenery" and in a tree above the greenery. He testified that the TBI agents took control of the money.

TBI Special Agent Lee DeArmitt testified that he accompanied Officer Beaver and Agent Chestnut in monitoring the June 13, 2008 drug transaction from Agent DeArmitt's car. His testimony mirrored the other witnesses who heard the audio transmission. Agent DeArmitt saw the defendant emerge from the back seat of the Cadillac and Officer Beaver chase the defendant through the woods. He testified that he saw a revolver and what he believed to be drugs in the driver's seat of the Cadillac. Agent DeArmitt testified that he saw the money on the ground and in a tree in the woods. He testified that the agents recovered the full amount of the drug-purchase money. He further testified that the serial numbers of the currency found in the woods matched the recorded serial numbers of the drug-purchase money. Agent DeArmitt testified that the location of the handgun and the drugs in the Cadillac was accessible from either the front seat or the back seat.

Jackson Police Department Sergeant Shane Beaver echoed the testimony of other officers about the pursuit and stop of the Cadillac. He chased one of the vehicle's occupants into the woods. He apprehended the man as he emerged from the other side of the woods. He identified the man as the defendant. Sergeant Beaver also echoed the previous testimony about finding the money along the path that the defendant took through the woods.

Artavis Douglas testified for the State that he had pled guilty to possession of cocaine

with intent to sell as a result of the June 13, 2008 incident. He testified that he had telephone conversations with a female and agreed to sell her about three ounces of cocaine for $2,700. He testified that he did not have the cocaine on hand when he made arrangements with the female and that he had to acquire it. Mr. Douglas told the defendant, who is Mr. Douglas' cousin, and Mr. Murrell about the pending deal. When the supplier brought the drugs to Mr. Douglas' residence, the supplier gave them to the defendant. Mr. Douglas testified that the defendant knew that a drug deal was afoot and that the defendant drove the green Cadillac to the meeting location.

Mr. Douglas testified that he initially went to the Lincoln. The female and a man later revealed as Agent Rhodes were inside. Mr. Douglas testified that he felt nervous and became "slick ass spook scared" about the situation and asked the female to go and get the defendant. Mr. Douglas testified that he wanted to get the Cadillac to come closer so he could leave. When Mr. Douglas returned to the Cadillac and expressed his fears, the female tried to reassure him, took a "package" out of the defendant's lap, and took the package to show Agent Rhodes. The female returned and said, "It's fine," but Mr. Douglas told his companions that they were going to leave. He testified that the defendant said, "'Man, do you want me to go on and take care of that?'" The defendant then got out of the Cadillac and went to the Lincoln. Mr. Douglas testified that he and Mr. Murrell were in the process of leaving in the Cadillac when the defendant left the Lincoln and jumped into the Cadillac.

Mr. Douglas testified that after the defendant took the cocaine from the supplier at the residence, the defendant never gave it to him. He testified that, initially, the defendant and Murrell were going to go to the meeting without him but that, when he saw the way the defendant was driving the Cadillac, Mr. Douglas got into the car at the last minute "to make sure [his] car wasn't being dogged out." Mr. Douglas testified that the defendant had the package of cocaine on him when he got into the back seat of the Lincoln. Mr. Douglas testified that he was unaware of the gun in the car prior to its discovery by the officers and that he had never seen it.

When asked whether the defendant went to the gas station "with the intent that his drug transaction would occur," Mr. Douglas replied, "Yeah."

On cross-examination, Mr. Douglas agreed that he conducted the meeting arrangements with the female informant, and he made the arrangements to get the cocaine from a supplier known as "Big V." He testified that the defendant had no role in making the various arrangements; however, he maintained that the defendant went from the residence to a car to get the cocaine from Big V. He said that the defendant "had the drugs last and he had them first."

-5-

TBI forensic scientist Donna Jacobsen testified that the material submitted to the TBI laboratory for analysis in this case was a total of 8.8 grams of cocaine base, a rock-like substance, and 2.7 grams of cocaine powder.

Shonda Davis testified that she was the paid confidential informant who worked with Agent Rhodes on June 13, 2008. She detailed setting up a meeting to buy three ounces of cocaine from Mr. Douglas, who she knew by the name "Thug." The purchase price was to be $2,700. When she walked over to the Cadillac after Thug came to the Lincoln, the defendant was seated behind the wheel. She testified that the defendant told her that he had a little less than three ounces of cocaine but that the price would be $2,700. The Cadillac pulled up to the Lincoln. The defendant got into the back seat of the Lincoln, and Ms. Davis got into the front seat. In the Lincoln, the defendant "showed the product. He had it laying [sic] in his lap." She testified that the defendant told Agent Rhodes that the defendant wanted to count the money. When the defendant got his hands on the money, he left the Lincoln and got into the Cadillac. He left no drugs.

On cross-examination, Ms. Davis denied that she ever took drugs from the defendant's lap while he was seated in the Cadillac. She testified that she obtained the "sample" from Thug. She testified that when the defendant got into the Lincoln, he "pulled the crack cocaine out of his pocket and laid it into his lap. He showed it." The defendant did not brandish a weapon.

TBI Special Agent Ramanda Chestnut testified that she was the "handler" for the paid confidential informant, Shonda Davis. On June 13, 2008, Agent Chestnut was part of the "surveillance team and the backup team for Special Agent Rhodes." She testified that, prior to the trip to the meeting site, she searched Ms. Davis and found no contraband, money, or weapons. Ms. Chestnut testified similarly to the other officers who observed the meeting from their respective vehicles. She agreed that, from the audio broadcast from the Lincoln, a drug transaction was in progress.

On cross-examination, Ms. Davis testified that the investigation began when Ms. Davis approached the officers and told them that she could buy drugs from a person she knew as Thug. She agreed that she had been involved as an informant in several undercover drug operations.

The defendant testified in his defense that he was 24 years of age and had a ninth grade education. He agreed that he had three and a half years to serve on a parole revocation in a previous aggravated robbery case. He admitted that he had two aggravated robbery convictions and one conviction of attempted aggravated robbery. He denied ever being involved with the sale or distribution of drugs. He denied knowing Big V and denied

knowing where the drugs at issue came from. He testified that when he came to Mr. Douglas' residence on June 13, 2008, Mr. Douglas told him "that he knew some people with $2,700 and wanted to know if I wanted to get it." He said he responded, "You know me." He agreed that this meant that he robs people. He testified that his intention on June 13, 2008, was to rob the people of the $2,700. He denied ever possessing, touching, or seeing the drugs on that date and denied possessing a weapon. He agreed that he was driving the Cadillac at the time in question. He testified that when Mr. Douglas came back to the Cadillac the last time, he told the defendant to "do what [he] was going to do," which, he said, was to "[t]ake the money." He agreed that taking the money was what he did. After Agent Rhodes handed the money to the defendant, he feigned counting it, then just got out of the Lincoln.

On cross-examination, the defendant testified that he, Mr. Douglas, and Mr. Murrell agreed before the meeting that the defendant was going to steal the money. He denied that the men had any drugs to sell on June 13, 2008. "It wasn't going to be no deal," he testified. He maintained that Agent Rhodes handed him the money to count without seeing any drugs. He admitted that during his flight through the woods, he attempted to hide the money in a tree.

Agent Ken Rhodes testified on rebuttal for the State that, when the defendant got into the Lincoln, he showed the agent material that the agent believed to be cocaine. He testified that he would not have given the defendant the money unless he had seen the drugs or unless the defendant took it by armed force. In this case, he said, the defendant showed the drugs and did not exhibit a weapon.

On appeal, the defendant challenges only his conviction of possession of cocaine with intent to sell. His single issue is whether the evidence supports this conviction. We hold that it does, and we affirm the conviction.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Winters, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. Winters, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. Id. at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence,

as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Id.

A criminal offense may be established exclusively by circumstantial evidence so long as the evidence excludes all other reasonable theories except that of the defendant's guilt. See State v. Crawford, 470 S.W.2d 610, 612 (1971). In addition, the weight of the circumstantial evidence is for the jury to determine, and this court may not substitute the jury's inferences drawn from the circumstantial evidence with our own inferences. See Pruitt v. State, 460 S.W.2d 385, 391 (Tenn. Crim. App. 1970).

A person is guilty of possession of a controlled substance with intent to sell when he knowingly possesses the substance and intended to sell it. T.C.A. § 39-17-417(a) (4). Possession for sale of .5 grams or more of cocaine is a Class B felony. Id. § 39-17-417(j)(5).

The term "possession" embraces both actual and constructive possession. State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In order for a person to "constructively possess" a drug, that person must have "'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or though others.'" Id. (quoting State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419 (1997).

It is basic law that intent may be shown--and often must be shown, if at all--by circumstantial evidence. See, e.g., State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997); State v. Chrisman, 885 S.W.2d 834, 838 (Tenn. Crim. App. 1994); State v. Burkley, 804 S.W.2d 458, 460 (Tenn. Crim. App.1990).

In the present case, the defendant's challenge to the legal sufficiency of his drug possession conviction is centered upon the failure of the surveillance video recording to show that the defendant possessed the cocaine while in the Lincoln with Agent Rhodes. The defendant also relies upon his testimony that he intended to steal the drug money, not sell the drugs.

Initially, we must point out that the video recordings of the June 13, 2008 events were not found in the appellate record. As such, we are not privileged to take into account the activities revealed by such recordings. This evidence was presented to the trier of fact, and

it was the responsibility of the defendant, as the appellant, to prepare and present on appeal a full, fair, and accurate record for review. Tenn. R. App. P. 24(b); see State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). In any event, the defendant claims merely that the video does not show the defendant's possession of cocaine while in the Lincoln. In his testimony, Agent Rhodes acknowledged that the defendant's possession of the cocaine was not shown on the video recording. Agent Rhodes testified that the video camera was misaligned due to the expectation that the person selling the cocaine would occupy the front passenger seat, not the back seat. Also, Agent Rhodes and Ms. Davis affirmatively testified that they saw the defendant in possession of the cocaine while he was in the back seat of the Lincoln. Under these circumstances, it is unlikely that the missing video recording would actually contradict the testimony of Agent Rhodes and Ms. Davis.

That said, the evidence sufficiently established that the defendant possessed cocaine with the intent to sell. In the light most favorable to the State and indulging inferences in the State's favor, the defendant was privy to the telephone arrangements to sell cocaine to Ms. Davis and to obtain it from a supplier for that purpose. The defendant took delivery of the cocaine from the supplier and possessed it until it was abandoned in the Cadillac, where it was found there by the officers. According to Mr. Douglas, he wanted to withdraw from the plan to sell the drugs, but the defendant persisted and went to the Lincoln in possession of the cocaine. Agent Rhodes and Ms. Davis testified that they saw the cocaine in the defendant's possession, and they testified to a conversation about his showing the drugs before he was given the money for counting. According to the defendant, he had no weapon to use in forcibly taking the cocaine. The jury was free to accredit the testimony of the State's witnesses. It was also free to discredit the defendant's testimony that no cocaine had ever been acquired and possessed by the defendant and his companions, especially given the officers' discovery of the cocaine in the Cadillac after it was stopped. We conclude that the evidence was sufficient to support the conviction.

Accordingly, the judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE